IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
February 18, 2014 Session

## IN RE ADOPTION OF MARISSA O.R.

## G.A.K. AND D.L.K. v. N.E.R.

An Appeal from the Chancery Court for Shelby County
No. CH-11-1180-1     Walter L. Evans, Chancellor

No. W2013-01733-COA-R3-PT - Filed May 30, 2014

This is a petition for termination of parental rights and adoption. The parents of the child at issue divorced in 2007. The father moved to Colorado, and the mother was designated the child's primary residential parent. The father was given parenting time in Colorado during the child's spring, winter, and summer vacations, as well as parenting time in Tennessee at any time, with reasonable notice. The father exercised his parenting time only for a single 30-day period each summer in 2008, 2009, and 2010. After the child's summer 2010 visit, the father scheduled no parenting time. In July 2011, the mother and her husband filed the instant petition to terminate the father's parental rights and for the mother's husband to adopt the daughter. The petition alleged abandonment by willful failure to visit during the four-month period preceding the filing of the petition. After a trial, the trial court denied the petition. It held that the petitioners did not establish grounds for termination and that the child's best interest would not be served by terminating the father's parental rights. The petitioners now appeal. After careful review of the record, we hold that clear and convincing evidence supports the termination of the father's parental rights, and so reverse the trial court's denial of the petition.

**Tenn. Rule App. P. 3 Appeal as of Right; Judgment of the Chancery Court is Reversed and Remanded**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J., W.S., and DAVID R. FARMER, J., joined.

Kevin W. Weaver, Cordova, Tennessee, for the Petitioner/Appellants G.A.K. and D.L.K.

Respondent/Appellee, N.E.R., *pro se* (no appellate brief filed)[1]

## OPINION

Petitioner/Appellant D.L.K. ("Mother") and Respondent/Appellee N.E.R. ("Father") married in 1996. Father's son from a previous relationship ("Brother") lived with Mother and Father. The parties' daughter ("Daughter"), the child at issue in this case, was born in April 1999. In April 2004, the family moved to Memphis, Tennessee.

About a year after the family moved to Memphis, Mother and Father separated. Father took Brother and left the marital home; for about two months, their whereabouts were unknown. In June 2005, Father and Brother returned to the marital home for two days. A few days later, Mother and Father became involved in a domestic dispute, and Father was arrested for domestic assault. After that incident, Father and Brother never returned to live at the marital home.

In October 2005, Mother filed a petition for divorce in the Circuit Court of Shelby County, Tennessee. Apparently Father never responded to the divorce petition; in February 2006, Mother obtained a divorce by default judgment. Between Father's brief return to Memphis in June 2005 and the February 2006 entry of the default divorce decree, Father exercised no parenting time with Daughter. The default divorce decree did not award Father any parenting time with Daughter.

In December 2007, after Father was finally located, the circuit court entered an amended final divorce decree that adopted a second permanent parenting plan.[2] The second permanent parenting plan, like the first, designated Mother as Daughter's primary residential parent; however, it also granted parenting time to Father. By the time the amended final decree was entered, Father was living in Salida, Colorado. Because of the distance, the second parenting plan awarded Father parenting time during the child's spring vacation, for part of Daughter's winter vacation, and for 30 days each summer.[3] The plan provides that, for summer vacation,

---

[1]Appellee was represented by counsel in the proceedings below, but the trial court's final order discharged his trial counsel from any further responsibility in the case.

[2]Although the circumstances surrounding the amended final decree are unclear, it appears that it was entered by consent of both Mother and Father.

[3]The second parenting plan states:

(continued...)

Father is entitled to exercise his parenting time either in Colorado or Tennessee, and he is to "advise Mother on or before May 1 of each year when he [would] exercise his summer parenting time." For one of the visits each year, the plan required Mother to pay half the cost of one airline ticket from Memphis to Colorado for the child or, at Father's option, pay Father $500 to defray the cost of his travel to Memphis to be with the child. The agreed plan stated that Father would be responsible for all other travel expenses.

The second parenting plan also required Father to pay Mother $223 per month in child support. The amount of the child support was calculated based on Mother having parenting time with the child 338 days per year and Father having 27 days of parenting time. It is undisputed that, from the time the amended divorce decree was entered until the trial in the proceedings below, Father substantially complied with his child support obligation. The second parenting plan is the plan that was in effect for Daughter at all times pertinent to this appeal.

On December 14, 2007, Father came to Memphis to sign the amended parenting plan. That day, he took Daughter to a school dance. Daughter was eight years old at the time. He then returned to Colorado.

The relationship between Mother and Father was strained, so Mother sought to schedule Daughter's parenting time with Father through emails or regular mail. When Mother tried to contact Father to schedule his spring 2008 parenting time, Father did not respond. However, in the summer of 2008, Daughter traveled to Colorado for Father to exercise 30 days of parenting time with her.

Likewise, in 2009 and 2010, Father exercised no parenting time during Daughter's spring or winter vacations, but Daughter traveled to Colorado for Father to exercise summer parenting

---

[3](...continued)

> Father presently resides in Salida, Colorado. Because of the distance, it presently is not contemplated that Father will be able to exercise parenting time pursuant to a day-to-day schedule. As such, Father shall have parenting time as set forth in the summer parenting time section, the spring vacation section and the winter vacation section below. Father may exercise this parenting time in Colorado, Tennessee or such other place as he desires. Father agrees to notify Mother as to where he will be exercising his parenting time with the child.
>
> In addition, Father shall be permitted to exercise parenting time with the parties' daughter in the Shelby County, Tennessee area upon reasonable notice at other times not specifically set forth herein. Reasonable notice shall be defined as notice at least seven days in advance.

According to the specific provision in the parenting plan, Father is to have parenting time with the child during the winter vacation from December 26 at 9:00 a.m. until 24 hours before the child is to resume school.

time with her. The record reflects that Mother emailed Father and wrote letters to him to schedule parenting time for him during the child's 2009 and 2010 spring and winter vacations, but Father did not respond. He exercised no parenting time beyond 30 days in Colorado in the summers of 2009 and 2010.[4] At no time did Father travel to Memphis to exercise parenting time with Daughter. His last parenting time with Daughter ended when the child left Colorado to return to Memphis on July 11, 2010.

Meanwhile, in May 2007, Mother met and began dating Petitioner/Appellant G.A.K. ("Stepfather"). They stopped dating for a time in June 2008 but resumed their relationship in November 2009. Mother and Stepfather were married in June 2011.

The next month, on July 18, 2011, Mother and Stepfather (collectively "Petitioners") filed the instant petition in the Chancery Court of Shelby County, Tennessee. The petition asked the trial court below to terminate Father's parental rights and permit Stepfather to adopt Daughter. The sole ground alleged for termination of Father's parental rights was willful abandonment by failure to visit the child for four consecutive months preceding the filing of the petition. *See* Tenn. Code Ann. § 36-1-102(1)(A)(i) (2010). Petitioners asserted that it was in Daughter's best interest to terminate Father's parental rights and allow Stepfather to adopt the child, thereby giving Mother and Stepfather "complete custody, control and guardianship of [her]." The trial court appointed attorney Carnita McKeithen as Daughter's guardian ad litem ("GAL"). Discovery ensued.

The trial court conducted a three-day trial on October 15 and 16, 2012, and March 25, 2013. By the time of trial, Father had moved from Colorado to Englewood, Florida; however, he did not notify Mother of his relocation. The testimony at trial focused primarily on Father's relationship with Daughter, particularly his contacts with her during the four-month period preceding the filing of the petition.

Mother testified at the outset. She told the trial court about Daughter's summer visits with Father in Colorado, noting that she paid the full expenses for Daughter to travel to Colorado for the first two summer visits and paid $500 toward the child's travel for the third summer visit. She testified that she reached out to Father at various times to try to get Father to schedule parenting time during Daughter's winter and spring breaks, but she never received a response from Father to any of her inquiries. Some of Mother's emails to Father were admitted into evidence as trial exhibits. In April 2010, in an effort to contact Father, Mother sent an email to his mother, Daughter's paternal grandmother ("Grandmother"), who lives

---

[4]In 2008, Daughter traveled to Colorado and stayed with Father from May 24, 2008 to June 24, 2008. In 2009, she traveled to Colorado and stayed with him from May 28, 2009 to June 28, 2009. In 2010, she traveled to Colorado and stayed with Father from June 12, 2010 to July 11, 2010.

-4-

in Canada.[5]   Mother's effort apparently bore fruit, as Father finally responded and they scheduled Daughter's summer 2010 visit.  Mother testified that Father never asked to attend any of Daughter's school functions and never made any attempt to have parenting time with Daughter other than the child's summer visits to Colorado referred to above.  Mother testified that she never refused to allow Daughter to speak to Father on the telephone or prevented Daughter from calling him.

Mother testified that Father exercised no parenting time with Daughter during the four-month period preceding the filing of the petition for termination.  By the time of the October 2012 hearing, Father had not exercised parenting time with the child for over two years.[6]

Mother testified that Daughter was given a cell phone in April 2010, and that Daughter used the cell phone as her primary way of communicating with Father.  A stipulated summary of the records for Daughter's cell phone, including text messages and phone calls, was entered into evidence; the records that were summarized in the exhibit dated from September 2010 to the first day of trial in October 2011.  The exhibit shows that, during the four months preceding the petition, text messages were exchanged between Daughter and Father on nine days.  Two phone calls took place during that entire time period, one of which was within the four-month period, and both were initiated by Daughter.  At no time did Mother and Father talk by telephone or text each other.

After the petition for termination was filed, but prior to trial, Father twice asked Mother to see Daughter.  The first request was made after Daughter's school year started in 2011; Father asked to take Daughter to Brother's graduation from Navy boot camp at the end of August before Labor Day Weekend.  Mother denied this request because Father asked to have Daughter for a full week, which would have required the child to miss school.  The second request was made in the summer of 2012, when Mother and Stepfather were driving the family to Florida to go to Disney World.  Daughter texted Father and told him that she was in Florida.  After he got Daughter's text, Father requested to visit with Daughter while the family was in Florida; Mother refused this request because it would have interrupted the

_____

[5]Daughter calls her paternal grandmother "Oma," which is a German term for grandmother.

[6]On the first day of trial, Father asked and was permitted to have lunch with Daughter.  At the conclusion of the second day of trial, Father asked if he could take Daughter to dinner that evening.  He also asked the trial court for permission to allow Daughter to attend Brother's graduation from nuclear power training with the Navy; the visit would require Daughter to be absent from school on November 8 and 9, 2012.  The trial court allowed the GAL to pose these questions to Daughter and let the child decide whether she wanted to go to either dinner or the graduation.  Daughter declined the invitation to go to dinner as well as the opportunity to attend Brother's graduation.

family vacation. Father and Daughter continued to text message occasionally after the termination petition was filed.

Mother testified that Daughter is an honor student and is very bright. She said that, since she and Stepfather began dating in May 2007, Stepfather has been very involved in Daughter's life. Mother described Stepfather as "fully committed" to Daughter. She testified that Stepfather has taken Daughter ziplining, to summer camp, and on family vacations. She said he is involved in her scouting activities, her school activities, and the school parent organization, adding, "The list is endless." Mother asserted that terminating Father's parental rights and allowing Stepfather to adopt Daughter would serve Daughter's best interest because Daughter "needs a father figure in her life, someone that she knows that she can depend on, that will always be there for her through thick and thin, that helps her, loves her, honors her, cherishes her, wishes her the best, motivates her." Mother maintained that Daughter needs another parent figure in her life who can make major decisions on her behalf, particularly if Mother were to become unavailable.

In contrast to Stepfather, Mother testified, Father gives Daughter little attention, knows nothing about Daughter's life, and provides her no insight or direction. Mother said that many Christmas and birthday celebrations have passed without Father visiting, calling, or sending Daughter a gift. Father's neglect often left Daughter disappointed and Mother at a loss as to how to explain it to her. Mother described Daughter's summer visits with Father as token visits, because Father spent little time with Daughter and often left her with Grandmother or Brother. Mother did not object to Daughter continuing to communicate with Father by cell phone and added, "she's a teenager, she has her own communication device." On cross-examination, Mother was asked if she agreed that the second permanent parenting plan was "a bit confusing." Mother responded, "No, sir, I think it's pretty black and white."

When Father left the marital home in April 2005, Mother said, he made no attempt to call or contact Daughter for over two years. This left Daughter distraught. In late 2005, to help Daughter deal with Father's choice to absent himself, Mother obtained counseling for Daughter with licensed clinical social worker Courtney Ciaramitaro. Mother said that Daughter appeared to benefit from her therapy sessions with Ms. Ciaramitaro. Years later, Daughter resumed counseling with Ms. Ciaramitaro, and occasionally she asked Mother to schedule an appointment with her when she needed to discuss an issue. Mother had her own counseling sessions with Ms. Ciaramitaro as well to help Mother deal constructively with related issues.

Mother admitted that, after Mother and Father separated, she and Father did not communicate well. For her part, Mother did not call Father when she took Daughter on out-of-state trips, when she enrolled Daughter in summer camp, or when Daughter had medical issues. At the

same time, however, Father never contacted Mother to inquire about Daughter, by email or otherwise. Mother repeatedly sought to contact Father through emails to him or to his mother, and she pleaded with him to exercise his parenting time with Daughter. These efforts were unavailing. Numerous emails sent to Father got no response, and parcels mailed to him came back. Mother said that Father never initiated a request for parenting time with Daughter — his few requests for parenting time were always prompted by an email from Mother. Father only responded to her requests on one occasion; other times they communicated through Grandmother. Their ability to communicate never improved over time.

Mother acknowledged that Daughter loves and cares for Brother. However, she maintained that, by the time of trial, the relationship between Daughter and Brother was "estranged." Mother claimed that Daughter and Father have no relationship at all. Mother said that Daughter "knows very little about him. And they do not have a bond at all, period." She claimed that, although Daughter has been willing to foster a relationship with Father, her attempts to communicate with him had "gone and fallen on deaf ears."

Mother's sister, Carrie McLaine ("Aunt"), testified on behalf of Petitioners. Aunt lives in Canton, Georgia. Daughter often visits Aunt during her summer, spring, and winter vacations, and Aunt testified that she and Daughter have a close bond. Aunt had often observed Daughter with Stepfather. She described Stepfather as very interactive with Daughter; she said that Daughter and Stepfather seem to be very close and that Daughter seems to enjoy being with Stepfather. Aunt had never observed Daughter with Father. Aunt noted in her testimony that when Daughter came to visit Aunt, Mother supplied Daughter with an AT&T card so that Daughter could call Father or Grandmother long distance while she was there.

The trial court took testimony in chambers from Daughter, 13 years old at the time of trial. Daughter told the trial judge that, while she and Father had had one or two phone calls, she had not seen Father "in a couple of years." Daughter perceived that the reason Father had not seen her was "money problems." She said that their primary mode of communication was text messaging on her cell phone. Daughter said that Mother had never prevented her from communicating with Father, and the only time Mother did not allow her to see Father was in the summer of 2012, while the family was on vacation in Florida.

Daughter was asked, "[I]f the Court were to let the termination happen and [Stepfather] to adopt you would you still want to communicate with [Father]?" Daughter responded, "Oh, yeah. He's my dad." She indicated that she would also like to continue communicating with Brother and Grandmother. Daughter explained that she does not talk to Brother often because he is in the Navy.

Daughter testified that, when she traveled to Colorado in the summers to see Father, she spent time with Father, Brother, and Grandmother. She said that she enjoyed the summers she spent at Father's home in Colorado. She biked, went to the movie theater where Brother worked, and engaged in other activities. Daughter said that, while Father worked during the day, she spent time with Brother and Grandmother.

Daughter said that she understood that termination of Father's parental rights meant that Father would have no legal right to contact her, and that Mother could prevent Daughter from communicating with Father. She further understood that Stepfather would become her legal parent. When asked, "[B]asically you'll be telling your father goodbye[.] . . . Is that really what you want to do?" Daughter replied, "Well, I want to talk to him," though she understood that Mother could choose to disallow any communication with Father. Daughter was also asked, "Do you want to go spend time with your father during the summertime?" She replied, "Yes." When asked if she missed seeing Father, Daughter replied, "Sometimes."

Daughter characterized her relationship with Stepfather as "[r]eally good." She explained that she has known Stepfather since she was seven years old. Daughter said that Stepfather helps around the house and helps her with her homework and other activities. He attends her activities at school and outside of school as well. She indicated that Stepfather participates in fun activities such as parties at their home and going to movies, and said that he takes her to Disney World "a lot." Daughter understood that, if the trial court permitted Stepfather to adopt her, she and Stepfather would have a father-daughter relationship, and Daughter indicated that she would like that. Asked whether she thought Mother would prevent her from communicating with Father, Daughter replied, "They're pretty good about it. They know I need communication with him so I'm sure they'll let me sometimes." Daughter said that she loves Stepfather and he loves her. She told the trial judge that she is in favor of the adoption. She noted that she has her own cell phone and said that she would be "fine with any communication" with Father.

Daughter's counselor, Ms. Ciaramitaro, also testified at trial on behalf of Petitioners. She recalled that, when Daughter was seven years old, she counseled Daughter twice a month for several months after Father and Brother left the marital home. Ms. Ciaramitaro said that she helped Daughter deal with the sadness and anxiety she experienced after the separation. In October 2011, Mother brought Daughter back for counseling. At that time, Mother had just remarried, one of Daughter's friends had just lost her mother, and Daughter was having little contact with Father. Daughter had five counseling sessions with Ms. Ciaramitaro. Daughter's lack of contact with Father was a main stressor for the child; Daughter reported to Ms. Ciaramitaro at that time that she had had no contact with Father except for "maybe two texts." According to Ms. Ciaramitaro, Daughter felt that Father did not want to be a part

-8-

of her life. After the counseling sessions, Ms. Ciaramitaro said, Daughter was more confident and better able to verbalize her feelings about the things that troubled her.

Stepfather testified on his own behalf. He said he had no biological children of his own. Stepfather became involved in Daughter's life when he and Mother started dating in 2007. Since he became involved with Daughter, Stepfather said, he tried to do things with her that any father would do, such as helping her with homework and school projects, going on recreational outings, and the like.

Father also testified at trial. In his testimony, Father could not recall when he next saw Daughter after the June 2005 domestic violence incident; except for a brief encounter at a police station, he said, he probably did not see her for 18 months. Father could not recall when he and Brother moved to Colorado; he said the move occurred in either 2006 or 2007. He claimed that he moved to Colorado to "get away from" Mother, but not to get away from Daughter. After he moved to Colorado, Father said, his communication with Daughter was via telephone, both through the home telephone and later by cell phone. In 2012, Father moved to Florida for the warmer weather. At the time he moved to Florida, Father said, he did not consider moving to Tennessee to be closer to Daughter.

When shown the second parenting plan during his testimony, Father acknowledged that he had read the parenting plan and understood it. Father claimed that the parenting plan gave him "one month a year" parenting time. To explain this conclusion, Father pointed to the section of the parenting plan that allocated him 27 days of parenting time and allocated Mother 338 days. Upon further questioning, Father conceded that the parenting plan actually gave him more than the one month he originally claimed, but Father indicated that he could exercise more parenting time only if Mother would return his telephone calls.

Father admitted that he had never exercised the parenting time awarded to him during Daughter's winter or spring vacations, but he pointed out that he had exercised parenting time with Daughter for three 30-day periods during the child's summer vacation. In order to set up the summer parenting time in compliance with the requirements of the second parenting plan, Father claimed, he emailed Mother at her three email addresses, telephoned Mother, and wrote Mother a letter. Father did not seek to admit into evidence any of his correspondence with Mother. In addition to the three periods of summer vacation time, Father said, in December 2007 when he was in Memphis for the hearing on the amended final divorce decree, he took Daughter to a dance at her school and went camping with her.

Father described the summers Daughter spent with him in Colorado as active. Grandmother stayed with Father and Daughter when Daughter visited, and Grandmother was Daughter's caregiver while Father was at work. While visiting, Daughter was able to go ziplining,

camping, hiking, mountain biking, and rafting. He acknowledged that Daughter spent some days with Brother while he was working at a movie theater, but Father said it was not the whole day. Father testified that his own work schedule as a locksmith was random in that he was on call at all times.

When presented with the emails entered into evidence by Mother, asking Father when he wanted to exercise his winter and spring parenting time, Father conceded that he remembered receiving some of them. Father asserted that he did not visit with Daughter during the child's spring break, winter break, or other times because: (1) Mother never returned his phone calls, and (2) transportation costs were prohibitive. Father cited Mother's 2011 refusal to allow Daughter to attend Brother's boot camp graduation, requested after the termination petition was filed, as an example of Mother's "standard response" to his requests for parenting time. However, when questioned, Father could cite no instance prior to the filing of the termination petition in which he requested parenting time with Daughter and was refused. Father admitted that he had never traveled to Memphis for the purpose of exercising parenting time with Daughter, and that he had seen Daughter in Memphis only when he traveled there to attend court hearings.

Father described his relationship with Daughter as "fantastic." When they see each other, he said, "It's the same ole hug and we get along just great." Father testified that he made notations of all of his attempts to telephone Daughter on calendars for the years 2006, 2007, and 2008. Father's notes indicated that, when he called to speak to Daughter, he sometimes received no answer and other times Daughter answered the telephone or returned his call. Father claimed that he made similar notations on calendars for the years 2009, 2010, and 2011, but said that he lost those calendars in his relocation from Colorado to Florida, so he could not include them in the evidence at trial.

Father was asked specifically about the four-month period preceding the filing of the termination petition, March 18 to July 18, 2011. Father acknowledged that he exercised no parenting time with Daughter during that period. He testified that he did not do so because he "was going to pick [Daughter] up and take her up to" Brother's graduation in August/September 2011. Father conceded that he did not discuss taking Daughter to Brother's graduation with Mother beforehand, but claimed that he assumed that Mother would not have permitted him to have parenting time with Daughter during the child's summer vacation and also during Brother's graduation week. In any event, Father said, he could not have afforded to have Daughter for both parenting times. Father acknowledged that the only contact he had with Daughter during the four months preceding the filing of the petition consisted of nine days in which they sent text messages to each other and the one phone call initiated by Daughter. He did not dispute the phone records reflecting those

communications.  Father claimed that he tried to call Daughter on her cell phone and on her home phone, but often got no answer.

Father also testified on the subject of finances. He said that, after he moved to Colorado, he was employed at all times as either a locksmith or as a zipline guide.  After he moved to Florida, he obtained a full-time job involving computers.  He owns his own home and also owns a vacation cottage in Canada.  Father indicated in his testimony that he and Brother traveled to visit his vacation cottage twice in 2007 and two more times after that.  He said that Brother traveled to Canada every year.  Father said that he and Brother have their own "little business" buying and selling things, and through this Brother earned the money for the trip every year.  Despite all of this, Father maintained that he had never traveled to Memphis for the purpose of seeing Daughter because his "money was not working."[7]  He admitted that no one had prevented him from exercising parenting time with Daughter.

Father testified that Daughter has a strong bond with Brother and Grandmother.  He claimed that Daughter's relationship with Brother is "fantastic" and that Daughter and Grandmother have a close relationship.  Father said that he wanted those relationships to continue and did not want the trial court to terminate his parental rights.

At the conclusion of the trial, the trial court took the matter under advisement. The trial court asked counsel for the parties to submit proposed findings of fact and conclusions of law.[8]

On June 18, 2013, the trial court entered its findings of fact and conclusions of law.  It concluded that the evidence did not establish that Father abandoned Daughter by willfully failing to visit her during the four-month period preceding the filing of the petition, and also concluded that termination of Father's parental rights would not be in Daughter's best interest.  The trial court found:

> 12.  From December 2007 until the initiation of these proceedings in July of 2011, a total of three years and seven months, [Father] exercised his parenting

[7]The record indicates that Father's mother owned real property in Canada.  In 2012, the Canada property was sold for $800,000, and Father received some portion of the proceeds.  For reasons that are unclear in the record, the trial court would not allow Mother's counsel to question Father about the portion of those proceeds he received.

[8]At the conclusion of the trial, Father asked the trial court for permission to exercise parenting time with Daughter on that day.  The trial court directed the parties to work together for a solution to Father's request.  The record does not reflect whether Father exercised any parenting time with Daughter after the hearing.

time with [Daughter] in December 2007 and during the summers of 2008, 2009, and 2010.

13. [Father] did not exercise his summer visitation with [Daughter] in 2011 or 2012.

. . .

15. Since the divorce between the parties, [Father and Mother] have had a very strained relationship and communication problem.

. . .

24. The Court finds that [Father] has attempted to communicate with his former wife in a manner reasonably necessary for him to maintain and develop his relationship with his daughter and therefore has not abandoned the child.

25. Despite the failure of his ex-wife, [Father] has attempted to maintain a relationship with his daughter as best he knew how and in a way that he knows his daughter would receive his communications via text message.

. . .

27. The Court further finds that the Parenting Plan designating [Father's] time with the minor child is ineffective to support Petitioner's [sic] Petition to terminate [Father's] parenting as it is full of ambiguity and limitations.

28. The Court further finds that the minor child has close and abiding ties with [Father's] family, including but not limited to [Brother and Grandmother], and that it would be against the best interest of the minor child to terminate Father's parental rights as this would also sever all familial relationships with her paternal extended family.

29. The Court further finds that [Father's] and [Daughter's] relationship is a loving Father-Daughter relationship, despite the difficulties faced by both, and the beautiful relationship that she has developed with [Stepfather].

. . .

35. That as a matter of law, only a parent's conduct **in the four months immediately preceding the filing of a petition** then before the court may be used as grounds to terminate parental rights under Tenn. Code Ann. § 36-1-102(1)(A)(i).

36. The Court further finds that, as a matter of law, that due to the ambiguity of the Parenting Plan, the first firm discernible date available for Father to exercise parenting time in the four months preceding the filing of Petitioner's [sic] Petition for Adoption and Termination of Parental Rights was June 1 or 5th, depending on the exact day on which he was to give notice; therefore the Petition was filed prematurely.

37. The Court further finds that the Petitioners' allegations of incidents that occurred far beyond the initial date of consideration of March 18, 2011 as a matter of law are not relevant and therefore are not to be considered.

38. Petitioners failed to prove by clear and convincing evidence that Father failed to maintain[] regular visitation or *other contact* with the child given the circumstances of this case.

39. The Court further finds as a conclusion of law that the Petitioners' [sic] failed to show that termination of Father's parental rights is in the best interest of the child pursuant to the factors contained in Tenn. Code Ann. § 36-1-113(i).

40. Petitioner's [sic] admitted that Father has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

41. The Court finds that contrary to the assertion of Petitioners, terminating Father's parental rights would not provide continuity and stability in [Daughter's] life.

42. The Court finds that simply because Stepfather has played an active role in [Daughter's] life does not constitute a valid reason to terminate Father's parental rights.

43. The Court further finds as a matter of law, that it is in the best interest of the child for her biological Father to continue to play a role in his daughter's life while she also maintains her relationship with her Mother and Stepfather and therefore, maintaining normalcy and continued support for [Daughter].

> 44.   The Court finds that it is not in the best interest of the child . . . to terminate the parental connection and rights of her biological father . . . .

(Emphasis in original).  Thus, the trial court recognized that Father did not in fact visit Daughter during the four months preceding the petition, but it held that Father's failure to visit during the statutory period was not "willful."  In addition, the trial court held that terminating Father's parental rights was not in Daughter's best interest under the circumstances of this case.

On August 14, 2013, the trial court entered a final judgment incorporating its findings of fact and conclusions of law.  The final order held that Petitioners "failed to prove by clear and convincing evidence any statutory grounds for termination," and that they "failed to prove that termination of Father's parental rights is in the best interest of the child."  There being no grounds to terminate Father's parental rights, the trial court denied the petition for termination and adoption.  The trial court denied Father's request for an award of attorney fees, but granted his request that Petitioners be deemed solely responsible for the GAL fees. Accordingly, the trial court ordered Petitioners to pay the GAL fees of $7,043.14.  From this order, Petitioners now appeal.[9]

### ISSUES ON APPEAL AND STANDARD OF REVIEW

On appeal, Petitioners argue that the trial court erred in three ways:  (1) in concluding that Petitioners did not prove by clear and convincing evidence the statutory ground of abandonment by failure to visit under Section 36-1-102(1)(A)(i), (2) in concluding that Petitioners did not prove by clear and convincing evidence that termination of Father's parental rights is in the child's best interest, and (3) in ordering Petitioners to pay 100% of the GAL fees.

Proceedings on the termination of parental rights are governed by statute in Tennessee.  A party with standing to seek the termination of the parental rights of a biological parent must first prove at least one of the statutory grounds for termination.  Tenn. Code Ann. § 36-1-113(c)(1) (Supp. 2013). Second, the party seeking termination must prove that termination of the parental rights of the biological parent is in the child's best interest.  Tenn. Code Ann. § 36-1-113(c)(2).

_____

[9]Father elected not to file a brief in this appeal.  Consequently, per this Court's order dated December 20, 2013, this matter was submitted to the Court for decision on the record, Petitioners' appellate brief, and the oral argument of Petitioners' counsel.

-14-

Because of the profound consequences of a decision to terminate parental rights, courts apply a higher standard of proof. The statutory elements required for termination of parental rights must be proven by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c); *see In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002); *In re Askia K.B.*, No. W2010-02496-COA-R3-PT, 2011 WL 4634241, at *7 (Tenn. Ct. App. Oct. 7, 2011). Evidence that meets the clear and convincing evidence standard "establishes that the truth of the facts asserted is highly probable, and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re Askia K.B.*, 2011 WL 4634241, at *7. "In contrast to the preponderance of the evidence standard, clear and convincing evidence should demonstrate that the truth of the facts asserted is 'highly probable' as opposed to merely 'more probable than not.' " *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005) (quoting *In re C.W.W.*, 37 S.W.3d 467, 474 (Tenn. Ct. App. 2000)). This heightened burden of proof serves to minimize the risk of an erroneous decision. *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004).

Because of the heightened burden of proof in these cases, the appellate courts adapt the customary standard of review as set forth in Rule 13(d) of the Tennessee Rules of Appellate Procedure. *In re Tiffany B.*, 228 S.W.3d 148, 156 (Tenn. Ct. App. 2007); *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005). Under this modified standard, we first review the trial court's findings of fact to determine whether they are supported by the preponderance of the evidence; the trial court's findings of fact are presumed correct unless the evidence preponderates against them. Tenn. R. App. P. 13(d); *see Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn.1993). We then determine whether the combined weight of the facts, as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establishes all of the elements required to terminate the biological parent's parental rights. *In re Tiffany B.*, 228 S.W.3d at 156; *In re S.M.*, 149 S.W.3d 632, 640 (Tenn. Ct. App. 2004). The trial court's conclusions of law are reviewed *de novo* on the record, affording them no presumption of correctness. *Campbell v. Florida Steel Corp.*, 919 S.W.2d 26, 35 (Tenn. 1996); *Presley v. Bennett*, 860 S.W.2d 857, 859 (Tenn. 1993); *In re Askia K.B.*, 2011 WL 4634241, at *7; *In re Tiffany B.*, 228 S.W.3d at 156.

ANALYSIS

## Grounds

Petitioners first argue that the trial court erred in concluding that they did not establish by clear and convincing evidence grounds for termination of Father's parental rights, namely, that Father willfully abandoned Daughter.

The statutory ground for terminating parental rights on which Petitioners rely is "[a]bandonment by the parent or guardian, as defined in § 36-1-102."[10]  Tenn. Code Ann. § 36-1-113(g)(1).  Section 36-1-102 includes five definitions for the term "abandonment," that is, five different ways in which a parent may be deemed to have abandoned the subject child. The first of the five definitions is the one at issue in this case:

> (1)(A) For purposes of terminating the parental or guardian rights of parent(s) or guardian(s) of a child to that child in order to make that child available for adoption, "abandonment" means that:
>
>> (i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent(s) or guardian(s) of the child who is the subject of the petition for termination of parental rights or adoption, that the parent(s) or guardian(s) either have ***willfully failed to visit*** or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child . . . .

Tenn. Code Ann. § 36-1-102(1)(A)(i) (emphasis added).  Under this definition, Petitioners claim only that Father abandoned Daughter by willfully failing to visit her during the four months preceding the filing of the petition for termination; they do not assert abandonment by failure to support.

To establish this ground, the party seeking termination must establish by clear and convincing evidence that the parent failed to visit the child during the critical four-month period that precedes the filing of the termination petition, and that the parent's failure to visit during that period was willful.  ***In re Adoption of Angela E.***, 402 S.W.3d 636, 640 (Tenn. 2013) (citing ***In re Audrey S.***, 182 S.W.3d at 864).  While the issue of whether the parent

---

[10]Only one ground need be established to support the termination of parental rights.  ***In re Adoption of Angela E.***, 402 S.W.3d 636, 641 (Tenn. 2013).

failed to visit the child during the pivotal time period is a question of fact, "[w]hether a parent's failure to visit or support constitutes willful abandonment . . . is a question of law." *Id.* (citing *In re Adoption of A.M.H.*, 215 S.W.3d at 810).

In this case, it is undisputed that Father did not visit Daughter during the critical four-month period — March 18 to July 18, 2011. The trial court found as a matter of fact that Father did not exercise spring vacation visitation in 2011, and he "did not exercise his summer visitation with [Daughter] in 2011 or 2012." Therefore, the issue presented is a question of law, namely, whether Petitioners established by clear and convincing evidence that Father's failure to visit Daughter during the four-month period was willful. In the context of termination proceedings, "Failure to visit or support a child is 'willful' when a person is aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so." *In re Audrey S.*, 182 S.W.3d at 864.

The trial court gave several reasons for holding that Father's failure to visit Daughter during the four-month period was not willful. Those reasons can be summarized as follows: (1) the operative parenting plan "is ineffective to support" the ground of abandonment because of its "ambiguity and limitations"; (2) the termination petition was filed prematurely because the first date available for Father to visit Daughter was on June 1 or 5, 2011; (3) Mother frustrated Father's attempts to maintain his relationship with Daughter; and (4) despite Mother's obstructive behavior, Father attempted to maintain his relationship with Daughter "as best he knew how" through text messages. As detailed below, after carefully reviewing the record, we must respectfully disagree with each of the reasons given by the trial court for its conclusion.

We first address the trial court's characterization of the operative parenting plan. First, from our review, the terms of the parenting plan are neither limiting nor ambiguous. The substantive terms of the parenting plan expressly provided Father with parenting time during each of Daughter's three major school vacation periods — spring, summer, and winter, and parenting time in Tennessee anytime he wished, with appropriate notice. These parenting time provisions for Father are the opposite of limiting; they give Father great leeway in scheduling parenting time with his child. The trial court did not specify the provisions it perceived as ambiguous. Father, however, did not have any trouble understanding the parenting plan. Father testified that he understood and agreed to the terms of the parenting plan.[11] Indeed, when Father was asked about Mother's many emails asking him when he

_____

[11]In his testimony, Father initially claimed that the operative parenting plan gave him a month of parenting time with Daughter, pointing to the fact that the parenting plan calculates his child support obligation based on 27 days of parenting time. In short order, however, Father admitted that he understood that the parenting
(continued...)

wanted to exercise his winter and spring parenting time, Father did not say that he did not understand that he was allocated parenting time during the spring and winter school breaks. When asked why he did not schedule parenting time with his child in Tennessee, again, Father did not testify that he did not understand from the parenting plan that he was permitted to see Daughter in Tennessee at any time that was convenient to him, with proper notice. Rather, in response to both inquiries, Father indicated that he was aware that he was permitted to have Daughter come visit him during her spring and winter breaks, and that he was aware that he was permitted to schedule parenting time with her at other times in Tennessee. He claimed instead that he did not have Daughter come visit him during the child's spring break or winter breaks, and did not come to Tennessee to visit her at other times, because Mother allegedly failed to return his phone calls and because of the cost of transportation. Thus, the record shows clearly that the parenting plan provided for ample parenting time for Father, that Father understood the substantive terms of the plan, and that Father specifically knew the time periods in which he was entitled to exercise parenting time with Daughter. Under these circumstances, we must conclude that the parenting plan had neither "ambiguity" nor "limitations" that created an obstacle to Father's ability to exercise parenting time with Daughter during the pivotal four-month period or any other time.

We must also respectfully disagree with the trial court's conclusion that Petitioners filed the petition for termination of Father's parental rights prematurely because, under the parenting plan, "the first discernible date available for Father to exercise parenting time" during the four-month period was June 1 or 5, 2011. Daughter's spring vacation occurred during the four months preceding the filing of the petition, and Father understood that he was entitled to exercise parenting time during the child's spring school vacation. Father knew that the parenting plan called for him to notify Mother by May 1 about scheduling his summer 2011 parenting time with Daughter, but he did not do so. Furthermore, Father made no attempt during the four-month period to exercise his right under the parenting plan to visit Daughter in Tennessee. Under these circumstances, we must respectfully reject the trial court's conclusion that the petition for termination of Father's parental rights was filed prematurely.

The trial court below credited Father's testimony that Mother had "been less than cooperative in his attempts since 2007 to have more visitation and parenting time" with Daughter. It found that Mother and Father had a "strained relationship" and that Mother often "frustrated [Father's] attempts to maintain a free flow of communications between him and his daughter." It consequently held that Mother's behavior was justification for Father's failure to seek parenting time with Daughter during the pivotal four-month period.

---

[11](...continued)
plan also gave him the right to exercise parenting time with Daughter during the child's spring and winter school breaks, and in Tennessee at any other times as well, with proper notice to Mother.

We defer to the trial court's assessment of the parties' credibility, and the evidence in the record supports the trial court's finding that Father and Mother had a strained relationship and had difficulty discussing issues. Certainly, "when a parent attempts to visit his child but is 'thwarted by the acts of others,' the failure to visit is not willful." *In re M.L.P.*, 281 S.W.3d 387, 392 (Tenn. 2009) (quoting *In re Adoption of A.M.H.*, 215 S.W.3d at 810); *see also In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). However, "[a] parent's failure to visit may be excused by the acts of another *only* if those acts actually prevent the parent from visiting the child or constitute a significant restraint or interference with the parent's attempts to visit the child." *In re M.L.P.*, 281 S.W.3d at 393 (emphasis added) (citing *In re Audrey S*., 182 S.W.3d at 864); *see also In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). Some examples of conduct that amounts to such a significant restraint or interference are: (1) telling a man that he is not the child's biological father; (2) blocking access to the child; (3) keeping the child's whereabouts unknown; (4) vigorously resisting a parent's efforts to support the child; or (5) vigorously resisting a parent's efforts to visit the child. *In re Audrey S*., 182 S.W.3d at 864 n.34.

Even fully crediting Father's testimony about Mother's actions, we conclude that the evidence does not support a finding that her behavior amounted to thwarting Father's attempts to visit Daughter or maintain a relationship with her. At most, it showed that Mother did not always answer the home telephone when Father called her home, and that Father's interactions with Mother caused him discomfort. Father's desire to avoid the discomfort of communicating with Mother to schedule visits is not a "justifiable excuse" for failing to see his child. *In re Audrey S*., 182 S.W.3d at 864. Moreover, Father admitted in his testimony that no one prevented him from exercising his right to have parenting time with Daughter. In addition, the undisputed evidence was that, in April 2010, Daughter got her own cell phone and Mother never interfered with Daughter's cell phone communications with Father. The undisputed evidence showed that Mother made a concerted effort to communicate with Father by email and regular mail, and even went so far as to contact the paternal grandmother in an effort to get a response from Father. The evidence showed that the summer visitations that occurred were scheduled as a result of Mother reaching out to Father by email, regular mail, and through the paternal grandmother. Father conceded that, prior to the filing of the termination petition, Mother never denied Father's request for parenting time. After reviewing the evidence, we must conclude that it does not support a factual finding that any actions by Mother or communication problems between Mother and Father amounted to a "significant restraint or interference" with any attempts by Father to visit Daughter in the four-month period preceding the filing of the petition or any other time.[12] *Id.*

-----

[12]The trial court below stressed that, "as a matter of law, only a parent's conduct **in the four months**
(continued...)

-19-

Finally, the trial court found that Father "attempted to maintain a relationship with his daughter as best he knew how and in a way that he knows his daughter would receive his communications via text message," and it relied on this factual finding to support its conclusion that Father did not willfully abandon Daughter. As discussed above, the evidence does not support a factual finding that Mother interfered in any significant way with Father's ability to see or communicate with Daughter. The fact that Father's contact with Daughter was essentially reduced to text messaging was a result of Father's choice, not necessity. Certainly a parent's effort to communicate with the subject child, such as Father's exchange of text messages during the pivotal four-month period, is relevant to the question of the willfulness of his failure to visit. "Telephone calls may be relevant. . . as contact between parent and child." *In re Amelia M*., No. E2012-02022-COA-R3-PT, 2013 WL 4715043, at *9 (Tenn. Ct. App. Aug. 30, 2013) (citing *In re Keri C*., 384 S.W.3d 731, 747-52 (Tenn. Ct. App. 2010)). However, text messages and the occasional telephone call do not stand in the stead of in-person parenting time with Daughter. "We find no precedent in which Tennessee appellate courts have held that telephone calls may function as visitation for purposes of determining whether a parent has willfully abandoned a child." *Id.* Under the circumstances of this case, we conclude that the exchange of text messages between Father and Daughter during the pivotal four-month period does not constitute "visitation," either token or otherwise, and does not preclude a finding that Father's failure to visit the child was willful.

At trial, Father admitted that, not only did he fail to exercise any parenting time with Daughter during the four months preceding the filing of the petition, he did not even try to schedule a visit with Daughter during that time period. He made no attempt to explain why he did not request spring vacation parenting time in 2011. To explain his failure to exercise or schedule any summer vacation parenting time, Father claimed that he had wanted Daughter to attend Brother's graduation in August/September 2011 and supposedly did not think that Mother would allow Daughter to stay with him twice in one summer. If so, the evidence does not show that Father shared with either Mother or Daughter his desire or intent to substitute Brother's graduation for any normal parenting time. Indeed, he said nothing

---

[12](...continued)
**immediately preceding the filing of a petition** then before the court may be used as grounds to terminate parental rights under Tenn. Code Ann. § 36-1-102(1)(A)(i)." (Emphasis in original). While this statement is technically correct, courts often must consider the parent's actions *outside* the four-month period in order to assess the willfulness of the parent's actions *within* the pivotal four-month period, as "part of the constellation of facts that must be considered to assess willfulness." *In re Kaleb N.F.*, No. M2012-00881-COA-R3-PT, 2013 WL 1087561, at *23 (Tenn. Ct. App. Mar. 12, 2013) (citing *In re Adoption of Kleshinski*, No. M2004-00986-COA-R3-CV, 2005 WL 1046796, at *19 (Tenn. Ct. App. May 4, 2005)). "The question of intent or willfulness depends on the totality of the circumstances." *In re J.G.H., Jr.*, No. W2008-01913-COA-R3-PT, 2009 WL 2502003, at *15 (Tenn. Ct. App. Aug. 17, 2009).

about Daughter attending Brother's graduation until after the termination petition was filed. However, because the trial court credited Father's testimony, and we defer to the credibility determinations of the trial judge, we assume for purposes of this appeal that Father's testimony accurately reflects his thought process during the spring and summer of 2011. Regardless, it does not constitute a "justifiable excuse" for Father's failure to visit Daughter or even attempt to schedule a visit during the determinative four-month period prior to the filing of the termination petition. *In re Audrey S.*, 182 S.W.3d at 864.

In connection with his testimony that he wanted Daughter to attend Brother's graduation in late summer/early fall of 2011 instead of the regular summer parenting time, Father also claimed that he could not afford to pay for Daughter to come see him for the summer visit and also attend Brother's graduation. The trial court did not rely on Father's purported financial restrictions in holding that Father's failure to visit was not willful. There is good reason for this, since the evidence in the record does not support Father's claim. Father testified that he owns his own home and that he also owns a vacation cottage in Canada. He testified that he and Brother traveled to Canada at least three times during the time in which he lived away from Daughter, and that he chose to move to Florida in order to live in a warmer climate. Furthermore, as discussed in more detail below, after Mother and Father separated, Father made a voluntary choice to move far away from his child. Thus, Father's assertion that his failure to visit during the statutory time period was caused by financial constraints is unavailing.

In this case, many of the challenges to Father in maintaining a relationship with Daughter stem from the fact that, after Mother and Father divorced, Father moved to Colorado. Any discussion of the "willfulness" of Father's failure to visit Daughter during the pivotal four-month period must take into account the difficulties caused by this distance. *See In re Joshua S.*, No. E2010-01331-COA-R3-PT, 2011 WL 2464720, at *15-16 (Tenn. Ct. App. June 16, 2011). This Court has recognized that, despite the parenting challenges created by such distance, a parent's decision to relocate out of the child's jurisdiction may be reasonable under certain circumstances. *Id.* In the case at bar, however, Father offered no reason for moving so far away from Daughter other than his desire to avoid contact with Mother. *See id.* at *16; *In re D.M.S.,* No. M2004-02584-COA-R3-PT, 2005 WL 1887526 at *9-10 (Tenn. Ct. App. Aug. 9, 2005). Even where a relocation is made for good reason, we have held that the parent must prioritize parenting time with his child and overcome the challenges created by the relocation. *See In re Joshua S.*, 2011 WL 2464720, at *16. In-person parenting time is essential to maintaining the parent-child relationship:

> [V]isitation is not a rote statutory requirement; it is necessary to maintain the
> thread of the parent-child relationship . . . . We have noted that an absence of

-21-

contact between parent and child for an extended period of time can lead to, in effect, the "death" of the relationship.

*Id.* (citing *In re Adoption of A.M.H.*, No. W2004-01225-COA-R3-PT, 2005 WL 3132353, at \*106 (Tenn. Ct. App. Nov.23, 2005) (dissent) *majority rev'd*. at 215 S.W.3d 793 (Tenn. 2007)).  When Father chose to live far from Daughter, it was incumbent on him to make the effort necessary to overcome the challenges his choice created.  This he did not do.  Contrary to Father's protestations, "this is not a case in which a parent was actively trying to maintain visitation" with his child.  *In re Adoption of Angela E.*, 402 S.W.3d at 642 (citing *In re Adoption of A.M.H.*, 215 S.W.3d at 810 (although parents did not visit during statutory four-month period, they were actively pursuing legal proceedings to regain custody); *In re Chelbie F.*, No. M2006-01889-COA-R3-PT, 2007 WL 1241252, at \*6 (Tenn. Ct. App. Apr. 27, 2007) (father was actively pursuing court order to establish visitation rights)).  Father simply failed to prioritize his relationship with Daughter.

From our careful review of the record, clear and convincing evidence establishes that Father was aware of his duty to visit Daughter, had the capacity to visit, made no attempt to visit, and had no justifiable excuse for not visiting.  *See In re Adoption of Angela E.*, 402 S.W.3d at 640; *In re Audrey S.*, 182 S.W.3d at 864.  We can only conclude that Father's failure to visit Daughter within the four-month period preceding the filing of the termination petition was willful. Accordingly, we must hold that Petitioners established by clear and convincing evidence the ground of abandonment under Section 36-1-102(1)(A)(i).

### Best Interest

Petitioners next argue that the trial court erred in holding that termination of Father's parental rights is not in Daughter's best interest.  As with grounds for termination, to obtain the relief sought, Petitioners must establish by clear and convincing evidence that terminating Father's parental rights is in Daughter's best interest.

In a case involving termination of parental rights, once the party seeking termination has established a ground for termination, the focus shifts from the parent's conduct to the child's best interest:

> The ultimate goal of every proceeding involving the care and custody of a child is to ascertain and promote the child's best interests.  However, as important as these interests are, they do not dominate every phase of a termination of parental rights proceeding.  The best interests of the child do not become the paramount consideration until the trial court has determined that the parent is unfit based on clear and convincing evidence of one or more of

the grounds for termination listed in Tenn. Code Ann. § 36-1-113(g). Once a parent has been found to be unfit, the interests of the parent and the child diverge. While the parent's interests do not evaporate upon a finding of unfitness, *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 1394-95, 71 L.Ed.2d 599 (1982), the focus of the proceedings shifts to the best interests of the child.

While a finding of parental unfitness is a necessary prerequisite to the termination of parental rights, a finding of unfitness does not necessarily require that the parent's rights be terminated. Not all parental misconduct is irredeemable. Thus, Tennessee's termination of parental rights statutes recognize the possibility that terminating an unfit parent's parental rights is not always in the child's best interests.

. . .

The child's best interests must be viewed from the child's, rather than the parent's, perspective. A focus on the perspective of the child is the common theme running through the list of mandatory factors specified in Tenn. Code Ann. § 36-1-113(i). By the time the court reaches the best interests analysis, it will have already made a finding, supported by clear and convincing evidence, that the parent is unfit or poses a risk of substantial harm to the welfare of the child. Accordingly, the exclusive focus on the perspective of the child in the best interests analysis does not contravene the parent's constitutional rights.

*In re Audrey S.*, 182 S.W.3d at 877-78 (citations omitted). Thus, grounds and best interest are two distinct elements. The perspective of the inquiry changes from the parent to the child, and courts must be mindful that the establishment of grounds for termination does not necessarily mean that termination of the parental rights of the biological parent is in the child's best interest.

To ascertain whether termination is in the child's best interest, courts are to consider the non-exclusive list of factors set out in Tennessee Code Annotated § 36-1-113(i):

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i). While all of the listed statutory factors are relevant, neither the trial court nor this Court need engage in "a rote examination of each of [these] nine factors and then a determination of whether the sum of the factors tips in favor of or against the parent. The relevancy and weight to be given each factor depends on the unique facts of each case." *In re Audrey S.*, 182 S.W.3d at 878.

In the instant case, the trial court held that Daughter's best interests would not be served by terminating Father's parental rights. The trial court reasoned that Daughter has "a loving

Father-Daughter relationship" with Father, and that Daughter "has close and abiding ties" with Father's family, that is, Brother and Grandmother. It noted that terminating Father's parental rights would, in effect, sever Daughter's ties with Brother and Grandmother as well as Father. The trial also found that terminating Father's parental rights would not provide continuity and stability to Daughter. It recognized that Stepfather has played an active role in Daughter's life, but held that this fact "does not constitute a valid reason to terminate Father's parental rights." The trial court also noted that Father has faithfully made his child support payments. The trial court held overall that "it is in the best interest of the child for her biological Father to continue to play a role in his daughter's life while she also maintains a relationship with her Mother and Stepfather and therefore, maintaining normalcy and continued support for [Daughter]." For all these reasons, the trial court held that terminating Father's parental rights is not in Daughter's best interest.

From our review of the record, the evidence shows that Father and Daughter had a close, loving father-daughter relationship before Mother and Father separated, and that Daughter still feels some affection for Father and for Father's family. To say, however, that Father still has a *parental* relationship with Daughter is to ignore the overwhelming weight of the evidence. The record shows convincingly that Father relinquished any parental role in Daughter's life many years ago.

As we noted above, in the aftermath of the divorce, Father chose to take Daughter's half-brother and move far away from Daughter, at a time when Daughter was quite young. In his trial testimony, Father tried to explain that he moved to Colorado to "get away from" Mother but not to get away from Daughter. In point of fact, however, he did just that. He chose not to see his child at all for the first two years after Mother and Father separated, which of course caused Daughter great heartache. After that, Father's efforts to reconnect were weak at best. Eschewing any parenting time during the child's spring and winter school breaks, Father scheduled parenting time during several summers — with Daughter traveling to Colorado to see him — only after Mother badgered him into responding to her contacts through email and through Grandmother. After Daughter's summer 2010 trip to see Father, even Daughter's summer trips to see Father stopped.

Astonishingly, the record reflects that, since Father left the marital home in 2005 — almost nine years ago — Father has *not once* traveled to Tennessee for the purpose of exercising parenting time with Daughter. Moreover, after the termination petition was filed, Father moved to Florida without notifying Mother; he testified at trial that it did not occur to him to consider moving back to Tennessee to be closer to Daughter.

Father emphasizes that he "maintained contact" with Daughter via her cell phone, through text messages and some phone calls. This does not take the place of seeing one's child

regularly and in person. ***In re Joshua S.***, 2011 WL 2464720, at \*16. Father chose to forego a parental relationship with Daughter, opting instead for a relationship more akin to a long-distance relative whom the child occasionally visits.

As the trial court noted, terminating Father's parental rights also severs Daughter's legal relationship with her half-brother and her paternal grandmother. While Daughter expressed affection for them, the record indicates that she does not see either Brother or Grandmother outside of her infrequent trips to see Father.[13] Consequently, severing Daughter's legal relationship with them is unlikely to affect Daughter's stability.

The trial court held that terminating Father's parental rights would not provide "continuity and stability" for Daughter. After carefully reviewing the record, we must respectfully disagree. After Father chose to essentially absent himself from Daughter's life, Stepfather clearly stepped into the breach.[14] Stepfather has demonstrated by word and deed that he is ready, willing, and able to be a parent to Daughter and provide her guidance that will serve her well in her teenage years. As the trial court observed, Daughter and Stepfather have a close, loving relationship. Daughter in fact testified that she *wants* Stepfather to adopt her. ***See In re Marr***, 194 S.W.3d 490, 494 (Tenn. Ct. App. 2005). Allowing Stepfather to adopt Daughter would legally recognize the place he already occupies in her life. It would clearly enhance Daughter's long-term stability, particularly if anything untoward were to happen to Mother and leave her unable to care for Daughter.

For all of these reasons, we must hold that clear and convincing evidence in the record establishes that terminating Father's parental rights and permitting Stepfather to adopt Daughter is in her best interest. Therefore, we must reverse the trial court's denial of Petitioners' petition for termination and for adoption.

### GAL Fees

During the proceedings below, the trial court issued an oral ruling that the fees for the GAL would be allocated equally between the parties. In its final order, however, the trial court

---

[13]Daughter testified that even if Father's parental rights are terminated, she hopes to maintain some contact with Brother and Grandmother. However, the record also indicates that, when offered the opportunity to attend Brother's graduation, Daughter elected not to miss school in order to attend.

[14]In his trial testimony, Father agreed that Stepfather is "a fine gentleman," "a great stepfather," and that Stepfather "has a close and loving relationship with [Daughter] and no one questions that." Father also agreed that Daughter and Stepfather have a strong and loving bond, and that Stepfather "is an absolutely prime example of what you want in a stepparent." Thus, it was stipulated that Stepfather is "a fine and suitable person to adopt [Daughter] in the event [Father] is determined to have abandoned . . . the child."

granted Father's request to assess Petitioners with 100% of the GAL fees. Petitioners argue on appeal that the trial court erred in ordering them to pay 100% of the GAL fees.

We review a trial court's assessment of costs for a clear abuse of discretion. *In re McCoy*, No. 03A01-9604-CH-00143, 1996 WL 599703, at *7 (Tenn. Ct. App. Oct. 21, 1996). In this case, the trial court below did not state a reason for its decision to assess the entirety of the GAL fees against Petitioners.

In light of the fact that we have reversed the trial court's ruling on the merits of the Petitioners' petition, we must reverse the trial court's decision to assess all of the GAL fees against the Petitioners. We instead order Father to pay half of the GAL fees and Petitioners to pay half of the GAL fees.

## CONCLUSION

In sum, we hold that clear and convincing evidence in the record establishes the ground of abandonment by failure to visit, and that terminating Father's parental rights is in Daughter's best interest. Accordingly, we reverse the trial court's denial of the petition for termination of parental rights and for adoption. Furthermore, we reverse the trial court's assessment of all of the GAL fees against Petitioners; we instead assess one-half of the GAL fees against Father and one-half of the GAL fees against Petitioners.

We reverse the trial court's decision, reverse the trial court's assessment of the fees of the GAL, direct the assessment of the fees of the GAL as set forth in this opinion, and remand for further proceedings consistent with this opinion. Costs on appeal are to be taxed to Respondent/Appellee N.E.R., for which execution may issue, if necessary.

_____
HOLLY M. KIRBY, JUDGE